1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALEX ANTHONY RUBIO,                Case No.   1:20-cv-00085-JLT-HBK (HC)

12                   Petitioner,        FINDINGS AND RECOMMENDATIONS TO
                                        DENY PETITION FOR WRIT OF HABEAS
13         v.                           CORPUS AND TO DECLINE TO ISSUE A
                                        CERTIFICATE OF APPEALABILITY [1]
14   ROSEMARY NDOH,
                                        FOURTEEN-DAY OBJECTION PERIOD
15                   Respondent.
                                        (Doc. No. 1)
16

17

18

19

20         Petitioner Alex Anthony Rubio ("Rubio" or "Petitioner"), a state prisoner proceeding pro

21   se, has pending a petition for writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. No. 1,

22   "Petition").  The Petition raises two grounds for relief:  (1) the evidence was insufficient to

23   support his conviction for murder and gross vehicular manslaughter; and (2) the trial court

24   committed reversible error by refusing to quash and traverse a warrant and suppress evidence of

25   his blood-alcohol level from a compulsory blood draw.  (*Id*. at 5-7).  For the reasons set forth

26   below, the undersigned recommends the district court deny Petitioner any relief on his Petition

27   ─────────────────────

28   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
     (E.D. Cal. 2022).

1    and decline to issue a certificate of appealability.

2                                    **BACKGROUND**

3          **A.  Procedural History**

4          Petitioner initiated this case on January 16, 2020 by filing a pro se petition for writ of

5    habeas corpus under 28 U.S.C. § 2254.  (Doc. No. 1).  On the same day, Petitioner filed a request

6    for stay and abeyance in order to pursue an ineffective assistance of counsel claim in state court.

7    (Doc. No. 2).  The then-assigned magistrate judge entered findings and recommendations to grant

8    the motion to stay.  (Doc. No. 4).  However, after clarification from the Court, Petitioner

9    withdrew his request for stay and abeyance, and the Court vacated the findings and

10   recommendations concerning the stay.  (Doc. Nos. 5-8).  After being ordered to respond to the

11   Petition, Respondent filed an answer and lodged the pertinent state court record on June 19, 2020.

12   (Doc. Nos. 12-13).  On September 17, 2020, after receiving two extensions of time, Petitioner

13   filed a traverse.  (Doc. No. 17).  On November 17, 2020, the case was reassigned to the

14   undersigned.  (Doc. No. 21).  The matter is deemed submitted on the record before the Court.

15         **B.  Facts Based Upon the State Court Record**

16         In 2015, a Kern County jury convicted Petitioner of second degree murder; gross

17   vehicular manslaughter while intoxicated with an enhancement for fleeing the scene; driving

18   under the influence and causing bodily injury, with enhancements for personally inflicting great

19   bodily injury; driving with a blood-alcohol content of 0.08 percent or greater and causing bodily

20   injury, with an enhancement for inflicting great bodily injury; failing to stop at the scene of an

21   accident with an enhancement for personally inflicting great bodily injury; misdemeanor resisting

22   or delaying a peace officer, and misdemeanor use of a controlled substance.  (Doc. No. 1 at 16;

23   Doc. No. 13-23 at 2-3).   The jury found Petitioner guilty of all enhancements except the

24   enhancement that Petitioner had a blood alcohol level over 0.15 percent.  (Doc. No. 13-23 at 3).

25   Petitioner was sentenced to 15 years to life on count one, the sentences on counts two through

26   five were stayed, and a concurrent 180-day jail term was imposed for the misdemeanor use of

27   controlled substance.  (*Id*.).

28         The Court adopts the pertinent facts of the underlying offenses, as summarized by the

California Court of Appeal.  Unless a petitioner demonstrates by clear and convincing evidence otherwise, a presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

## FACTUAL BACKGROUND

On January 3, 2014, at approximately 3:00 a.m., Rubio drove his Chrysler 300 southbound on New Stine Road in Bakersfield and entered the intersection with Ming Avenue at a speed of 118 miles per hour with his accelerator pedal fully depressed. There, he struck the left side of a Toyota Celica driven by Almonidovar, who had been traveling eastbound on Ming Avenue. An eyewitness who was not involved in the collision testified at trial that he believed the traffic on Ming Avenue had the green light, although his memory was "foggy."[3]

> [FN 3]: The eyewitness also testified that Almonidovar was traveling westbound on Ming Avenue, contrary to the testimony of a witness who was experienced in accident reconstruction.

Rubio drove his vehicle through the passenger area of Almonidovar's vehicle, resulting in Almonidovar's death. Almonidovar had scrapes and fractures on her left arm and the left side of her head was crushed and flattened. Almonidovar had a blood-alcohol concentration of 0.12 percent.[4]

> [FN 4]: The jury was instructed that information regarding Almonidovar's blood-alcohol level could be used "only as to the red light/green light issue and for no other purpose."

Rubio's vehicle went airborne, rolled over, struck a traffic signal pole and utility box, and slid on its roof before coming to rest on New Stine Avenue, 596.55 feet from the initial area of impact. Hair and bodily fluids were found on Rubio's front bumper and the underbody of his vehicle. Half of the roof of Almonidovar's vehicle was found next to Rubio's vehicle.

Rubio, uninjured, fled the scene of the collision on foot. He jumped a nearby wall and spent time hiding in a backyard on an adjacent cul-de-sac. Eventually, he exited the yard into an alleyway, where he was spotted by Officer Aaron Mundhenke. Officer Mundhenke pursued Rubio on foot, chasing him over three six-foot fences before pulling him to the ground. Rubio ignored Officer Mundhenke's instructions to put his hands behind his back, instead putting his hands underneath himself near his waistband. Officer Mundhenke struck Rubio in the lower left leg with a collapsible baton and hit Rubio in the face several times before eventually subduing and handcuffing him. Once on his feet, Rubio stated, "I'm fucked up. I'm sorry. I ran from the car because I was scared."

Officer Mundhenke delivered Rubio to Officer Richard Bittleston, who placed Rubio in a patrol car. There, Rubio spoke with Officer

Christopher Bagby. Officer Bagby concluded Rubio was severely impaired by alcohol: Rubio's eyes were watery, he had slurred speech, an odor of alcohol emanated from his person, and he had poor motor coordination. Additionally, Rubio was belligerent, hostile, extremely angry, disrespectful to officers, and shouting profanities. In Officer Bagby's opinion, Rubio was impaired in his ability to safely operate a motor vehicle.

Officer Bittleston transported Rubio to Kern Medical Center. Officer Bittleston did not ask Rubio any questions or share with Rubio any facts regarding the case. Nonetheless, Rubio told Officer Bittleston that a female had been driving his car. Rubio asked, "How bad did that chick fuck up my car?" When Officer Bittleston did not respond, Rubio stated, "Come on, man. How bad is my car fucked up?"

At Kern Medical Center, Rubio was evaluated by Officer Glenn Phippen. Officer Phippen immediately smelled a strong odor of alcohol on Rubio's breath and person. He noticed Rubio's eyes were bloodshot and watery, and Rubio had difficulty balancing and walking. Officer Phippen performed three field sobriety tests and Rubio's performance on each indicated he was under the influence of alcohol or a depressant. On the horizontal gaze nystagmus test, Rubio displayed nystagmus and a lack of smooth pursuit. On the walk-and-turn test, Rubio failed to follow instructions, took a wide stance to maintain his balance, missed each heel-to-toe step by at least three inches, was unable to walk a straight line, and raised his arms to maintain balance. On the one-leg-stand test, Rubio was only able to maintain his balance for a few seconds before raising his arms and putting his feet down. Based on these tests, Officer Phippen determined Rubio was under the influence of alcohol and unable to safely operate a motor vehicle.

Officer Phippen asked Rubio to take a blood test but Rubio refused. Officer Phippen telephoned Officer Antonio Orozco and requested that he obtain a warrant to draw Rubio's blood. While waiting for the warrant, Rubio asked if he could "blow to see where he was at." Officer Bittleston then administered a breath test to Rubio. In two tests, administered at 6:00 a.m. and 6:03 a.m., respectively, Rubio blew a 0.14 percent. At approximately 6:40 a.m., Rubio's blood was drawn pursuant to the warrant. The blood draw revealed a blood-alcohol concentration of 0.13 percent.

Prior to the collision, Rubio had signed three separate Department of Motor Vehicles applications for a commercial driver's license, each time affirming under the penalty of perjury that he understood the form's admonitions, which included the following:

"I hereby advise that being under the influence of alcohol or drugs or both impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both.

"If I drive under the influence of alcohol or drugs or both,

4

and as a result a person is killed, I may be charged with murder."

At trial, Rubio testified that, on January 2, 2014, he met up with friends at a bowling alley at approximately 8:30 p.m. There, he consumed three beers and a shot of "Fireball." He left the bowling alley alone at approximately 11:19 p.m. and drove to a bar called the VIP. He stayed there for 45 minutes to one hour and drank two beers. He then walked to an adjacent lounge that does not serve alcohol and stayed there for an hour and a half to two hours.

Rubio left the lounge without difficulty and began driving. He did not think he was impaired. At trial, he could not recall the speed he was traveling but knew "for a fact" that he was not traveling over 100 miles per hour. He did not recall having his accelerator fully depressed and could not recall whether he applied his brakes or took his eyes off the road as he entered the intersection of Ming Avenue and New Stine Road. He recalled that he had a green light. He claimed he never saw the other car. He described the accident as follows:

> "I had a green light. As I was going through the intersection, I heard it before I felt it. And what I mean by that, is, um, I heard a huge, loud bang coming from my passenger rear side.
>
> "And as I turned my head to the right, my car was already going upside down in a barrel roll. And from that point, everything was slow motion. And I—I—from that point, I just remember looking over my shoulder, and then my car being like—going like this, slow motion."

Rubio explained that he fled from the scene of the collision because he was scared and did not want to get in trouble.[5] He ran from Officer Mundhenke because he was afraid of the police. After jumping three fences, he realized the worst that would happen was that he would get a DUI; he therefore stopped and put his hands up. According to Rubio, Officer Mundhenke hit him without cause, and continued to hit him after he was handcuffed.

> [FN 5]: Rubio initially claimed that he was scared because he had never been in trouble with the law.  However, after a break in testimony, he acknowledged that he had pending misdemeanor charges that preceded the collision.

Rubio denied asking Officer Bittleston about the state of his car. He denied telling Officer Bittleston that a female had been driving his car. He instead claimed he told Officer Bagby about a female driving his car, but did so only because Officer Bagby was "mean" and Rubio was hurt by his comments. He wanted Officer Bagby to leave him alone. Rubio testified he did not know at the time that anyone had been hurt in the accident.

At the hospital, Officer Phippen administered field sobriety tests and told Rubio he had done well. Officer Phippen also told Rubio

he did fine on the breath test. Rubio confirmed he refused to submit to a blood test until the police obtained a search warrant.

In the days following the collision, Rubio made several phone calls from jail. In a telephone call with his mother, his mother stated, "And I been telling you son. 'Son stop. Son stop.' You're – the last conversation that you and I had, 'You're gonna hurt somebody or you're gonna hurt yourself.' " She went on, "Okay, but—but do you remember me telling you—what were my last words when you walked out the door last night?" In another call, his mother stated, "I'm not gonna sit here and tell you I told you so. I'm not. But I wish you would have heard me when I was crying out to you this whole time.... 'Cause I told you it would happen one day." Rubio claimed his mother was referring to him having broken up with his girlfriend and needing to become a family man.

In another jail call, Rubio's then-ex-girlfriend stated, "Why did you drive?" and "I always tell you not to." Rubio did not know why she said this. In another call, his ex-girlfriend stated that "everybody" had told Rubio to "calm down." Rubio did not know why she said this but speculated she meant they should have gotten back together for their child.

In jail calls with a friend and with his father, Rubio maintained the lie that someone else was driving his car at the time of the collision and stated that he was going to beat the case. He testified that he did so because he wanted to be left alone and was concerned police might be listening to the call.

Rubio testified that he did not think it dangerous to drink and drive and believed himself to be "fine" to drive with a 0.08 percent blood-alcohol concentration. He acknowledged that it could be dangerous to drive impaired, depending on the level of impairment. He believed it safe to drive down New Stine Road at a speed of 75 miles per hour, but a speed over 80 miles per hour would be excessive and dangerous. He claimed that "90 percent of people have dranken [sic] alcoholic beverage and gotten—or beverages and gotten behind the wheel. [¶] The difference between the people convicted and what—I mean, some people have been caught. Some people haven't." He acknowledged that he had "some fault" for the collision but maintained that it occurred because "both parties drank and drove."

Rubio acknowledged signing the commercial driver's license applications, affirming under the penalty of perjury that he had read the admonitions on the applications. He testified, however, that he did not actually read the admonitions.

(Doc No. 13-23 at 3-8); *People v. Rubio*, No. F073217, 2018 WL 6252015, at *2–4 (Cal. Ct. App. Nov. 29, 2018).

*///*

*///*

6

## II.  APPLICABLE LAW

### A.  AEDPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.  *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572 U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

7

133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

As discussed earlier, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

the federal court should "look through" the unexplained decision to

8

> the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

> When . . . there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102.  If such disagreement is possible, then the petitioner's claim must be denied. *Ibid*.

*Sexton*, 138 S. Ct. at 2558..

### III.  ANALYSIS

For purposes of reviewing Petitioner's claim, the Court considers the last reasoned decision on Petitioner's claims—that of the California Court of Appeal.  Because the Court of Appeal rejected petitioner's claims on the merits, the deferential standard of § 2254 applies.

**A.  Ground One: Insufficient Evidence**

**1.  Background**

Petitioner argues there is insufficient evidence to support his conviction of implied malice second degree murder because "the lack of evidence that he drove recklessly prior to the events surrounding the collision, his unlawful but less than extraordinary level of alcohol intoxication, and his very minimal life experiences, warnings, or education about the dangers of intoxicated or reckless driving – fail to prove that he consciously disregarded the life-threatening risk that his driving posed to others."  (Doc. No. 1 at 24-25).  In addition, Petitioner argues that his unsafe driving at the time of the collision was "far less egregious" than the "deplorably reckless driving maneuvers" in other cases where courts have found sufficient evidence of implied malice, such as crossing into opposing traffic, trying to pass other drivers in an unsafe manner, or committing

1   other "extremely dangerous maneuvers" at the time of collision.  (*Id.* at 28).

2          In its Answer, Respondent cites in full the California Court of Appeal opinion addressing

3   the sufficiency of the evidence.  (Doc. No. 12 at 16-20 (citing Doc. No. 13-23 at 9-16)).

4   Respondent argues a fairminded jurist could find sufficient evidence of implied malice to support

5   Petitioner's second degree murder conviction, and a fairminded jurist could find sufficient

6   evidence of gross negligence to support Petitioner's conviction for gross vehicular manslaughter

7   while intoxicated.  (Doc. No. 12 at 22-26).

8                           **2.  State Appellate Court Decision**

9                           **I. Evidence of Implied Malice**

10          Rubio argues the evidence is insufficient to support a finding of
            implied malice as required to support his conviction for second
11          degree murder. He acknowledges evidence that he drove at a speed
            "more than twice the posted speed limit and possibly disregarded a
12          red light," but contends this does not support a finding of implied
            malice because he did so at an hour when few other drivers were on
13          the road, he was not "driving unsafely" prior to the collision, his
            level of alcohol intoxication was not "extraordinarily high," his
14          exposure to warnings about the dangers of reckless or intoxicated
            driving was minimal, and his conduct was less aggravated than that
15          found in other vehicular murder cases. We reject Rubio's arguments
            and conclude the evidence is sufficient to establish implied malice.
16
            In reviewing the sufficiency of the evidence, " 'we review the
17          whole record in the light most favorable to the judgment to
            determine whether it discloses substantial evidence—that is,
18          evidence that is reasonable, credible, and of solid value—from
            which a reasonable trier of fact could find the defendant guilty
19          beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th
            500, 507.) "We must presume in support of the judgment the
20          existence of every fact that the trier of fact could reasonably deduce
            from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.)
21          "The conviction shall stand 'unless it appears "that upon no
            hypothesis whatever is there sufficient substantial evidence to
22          support [the conviction]." ' " (*Cravens, supra*, at p. 508.)

23          To support a finding of implied malice, the evidence must establish
            that the defendant deliberately committed an act, the natural
24          consequences of which were dangerous to life, with knowledge of
            its danger to life and a conscious disregard of that danger. (*People
25          v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson* ).) This conscious
            disregard for the danger to the life of another distinguishes implied
26          malice from gross negligence, which involves "the exercise of so
            slight a degree of care as to raise a presumption of conscious
27          indifference to the consequences." (*Id.* at p. 296.) "Phrased in
            everyday language, the state of mind of a person who acts with
28          conscious disregard for life is, 'I know my conduct is dangerous to

                                        10

others, but I don't care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifferences to the consequences is simply, 'I don't care what happens.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987–988 (*Olivas*).) The standard for implied malice is subjective and therefore requires that the defendant actually appreciated the risk involved. (*Watson*, *supra*, at pp. 296–297.)

*Watson* is the leading case on vehicular murder involving implied malice. (*Watson*, *supra*, 30 Cal.3d 290.) There, the defendant drove to a bar and consumed large quantities of beer. After leaving the bar, he drove through a red light and narrowly avoided a collision with another car. He then drove away at high speed, accelerating to 84 miles per hour before suddenly braking and skidding into an intersection where he collided with another car, killing two people. Watson's blood-alcohol level one-half hour after the collision was 0.23 percent. An information charged him with two counts of second degree murder, but the trial court dismissed the murder counts. (*Id.* at pp. 293–294.)

On the People's appeal, our Supreme Court reversed the dismissal, holding there was sufficient evidence to uphold the second degree murder counts in the information. (*Watson*, *supra*, 30 Cal.3d at p. 301.) The court cited to the following evidence as sufficient to support a finding that the defendant acted with conscious disregard for life: the defendant's blood-alcohol level was sufficient to find him legally intoxicated; he drove to the establishment where he was drinking knowing that he had to drive later; he presumably was aware of the hazards of driving while intoxicated; he drove at high speeds on city streets, creating a great risk of harm or death; and he was aware of the risk, as shown by the near collision and his belated attempt to brake before the fatal collision. (*Id.* at pp. 300–301.)

Since *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol. (E.g., *People v. Wolfe* (2018) 20 Cal.App.5th 673, 683 (*Wolfe*) [driver had blood-alcohol level of 0.34 percent, was aware of dangers of drinking and driving and had previously used a taxi service, drank with intention of driving home, and continued driving her damaged vehicle after hitting a pedestrian]; *People v. Autry* (1995) 37 Cal.App.4th 351, 358–359 (*Autry*) [driver had a blood-alcohol level of 0.22 percent, was warned of the dangers of drinking and driving, drank and drove throughout the day, had three near misses, and continued driving over protests of his passengers]; *People v. Murray* (1990) 225 Cal.App.3d 734, 746–747 [driving wrong way on a freeway with a blood-alcohol level between 0.18 and 0.23 percent]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 533 [crossing into oncoming traffic on two-lane highway with a blood-alcohol level of 0.27 percent]; *Olivas*, *supra*, 172 Cal.App.3d at p. 989 [extremely dangerous driving while under influence of PCP and "negligible" amount of alcohol].) These opinions have generally relied on some or all of the factors that were present in *Watson*: "(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to

drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*Autry*, *supra*, at p. 358.)

Considering these factors here, there was substantial evidence to support a finding of implied malice. First, Rubio was intoxicated beyond the legal limit and had a predrinking intent to drive. He drove alone to one location and consumed several alcoholic beverages before driving alone to another location and drinking more. His blood-alcohol concentration was at least 0.14 percent. Officers observed him to have watery eyes, slurred speech, an odor of alcohol, impaired motor coordination, and odd behavior. He also performed poorly on field sobriety tests.

Furthermore, Rubio had knowledge of the hazards of driving while intoxicated. He signed driver's license applications affirming he had been advised that driving under the influence of alcohol and drugs could lead to a murder charge. He also had been told by friends and family not to drive, and had been warned by "everyone" that he needed to calm down.

Perhaps most significantly, Rubio's driving was extremely reckless—he drove through a red light at a speed of 118 miles per hour (73 miles per hour over the applicable speed limit), without braking and with his accelerator fully depressed. "Whether [defendant] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [defendant] was aware of the risk." (*People v. Moore* (2010) 187 Cal.App.4th 937, 941 (*Moore*).) Rubio also testified that driving on New Stine Road at a speed over 80 miles per hour is dangerous, and he therefore knew the hazards inherent in his reckless driving. A reasonable juror could conclude that this conduct, taken together, evidences a conscious disregard of the danger he posed to the lives of others on the roadway.

Rubio nonetheless presents several reasons he believes the evidence is insubstantial. He contends that his level of intoxication was not extraordinarily aggravated. However, *Watson* does not require an extraordinary level of intoxication. Indeed, courts have found implied malice in vehicular murder cases even where the driver was sober. (*Moore*, *supra*, 187 Cal.App.4th at p. 941 [running a red light at 70 miles per hour without attempting to brake]; *People v. Ortiz* (2003) 109 Cal.App.4th 104, 106–107 [crossing double yellow line into oncoming traffic to pass another car at 65 miles per hour].) The relevant question is not whether Rubio was extraordinarily intoxicated, but whether driving at his level of intoxication posed a risk to the lives of others, and whether he was aware of that risk.

In this regard, Rubio contends that his knowledge of the risks of impaired or intoxicated driving was "minimal." While some cases involve detailed evidence of the defendant's knowledge of these risks (e.g., *Autry*, *supra*, 37 Cal.App.4th at p. 355; *People v. David* (1991) 230 Cal.App.3d 1109, 1112–1113), such knowledge is generally presumed. (*Watson*, *supra*, 30 Cal.3d at pp. 300–301.) "A

high level of intoxication sets the stage for tragedy long before the driver turns the ignition key. 'There is a very commonly understood risk which attends every motor vehicle driver who is intoxicated.' " (*People v. Bennett* (1991) 54 Cal.3d 1032, 1038 (*Bennett*).) " 'One who wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*Watson*, *supra*, at pp. 300–301.) In any event, we reiterate the evidence on which a reasonable juror could conclude Rubio was actually informed of the danger to life that he posed: he signed driver's license applications acknowledging, under penalty of perjury, that he was advised that a potential consequence of driving under the influence was that he could be charged with murder (*Wolfe*, *supra*, 20 Cal.App.5th at p. 683), and, he was warned by friends and family not to drive because something like this could happen.

We also reject Rubio's claim that his driving was not so "blatantly dangerous" that he must have known the danger to the lives of others. While many vehicular murder cases involve pre-collision mishaps or near-misses that clearly warned the driver that his conduct was dangerous, near-misses are not required to support a finding of implied malice. (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 971 [only potential warning to driver was when his car went airborne as it crossed railroad tracks prior to collision].) Again, the evidence here showed that Rubio ran a red light at a speed of 118 miles per hour, 73 miles per hour over the legal speed limit. It is difficult to imagine a set of facts less likely to preclude a jury from concluding that this conduct evidences a complete disregard for the lives of others.

Rubio nonetheless suggests that, because the accident occurred at an hour when the roads were less occupied, the risk to others was somewhat diminished. However, even if the danger to others was diminished by the late hour, it was not extinguished. The site of the collision was not deserted. Even if Rubio believed a collision at this hour was less likely, such belief would merely reflect that he was aware he posed some danger to the lives of others but determined the risk was acceptable.

Lastly, Rubio cites several vehicular murder cases and attempts to distinguish each of them based on their facts. However, there is no specific formula for determining whether the evidence is sufficient to support a showing of implied malice. Rather, the evidence must be evaluated on a case-by-case basis. (*Olivas*, *supra*, 172 Cal.App.3d at p. 989; *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091.) None of the cited cases compels us to reverse on the facts presented here. Nor does Rubio cite any published opinion in which a *Watson* murder conviction has been reversed based on a claim of insufficiency of the evidence.

Reviewing the evidence as a whole, we conclude the murder conviction is supported by substantial evidence.

13

## II. Evidence of Gross Negligence

Rubio argues the evidence was insufficient to establish gross negligence as required to support his conviction for gross vehicular manslaughter while intoxicated. Although he acknowledges evidence establishing that he was "greatly impaired" and drove through an intersection at an excessive rate of speed, he contends this evidence supports no more than ordinary negligence. We disagree.

A conviction for gross vehicular manslaughter while intoxicated requires a finding of gross negligence. (§ 191.5, subd. (a); *Bennett*, *supra*, 54 Cal.3d at p. 1036.) As stated above, gross negligence is " 'the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [] "The state of mind of a person who acts with conscious indifferences to the consequences is simply, 'I don't care what happens.' " ' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1204 (*Ochoa*), quoting *Bennett*, *supra*, at p. 1036.)

In evaluating whether the defendant acted with gross negligence, "the jury should ... consider all relevant circumstances, including level of intoxication, to determine if the defendant acted with a conscious disregard of the consequences rather than with mere inadvertence." (*Bennett*, *supra*, 54 Cal.3d at p. 1038; *see Ochoa*, *supra*, 6 Cal.4th at p. 1207.) These circumstances include "the manner in which the defendant operated his vehicle, the level of his intoxication, and any other relevant aspects of his conduct." (*Ochoa*, *supra*, at p. 1207.) The defendant's level of intoxication is particularly relevant because " '[o]ne who drives with a very high level of intoxication is indeed more negligent, more dangerous, and thus more culpable than one who drives near the legal limit of intoxication ....' " (*Bennett*, *supra*, at p. 1037.)

Gross negligence is evaluated under an objective standard; that is, whether a reasonable person in defendant's position would have been aware of the risks involved. (*Ochoa*, supra, 6 Cal.4th at p. 1204.) Although this test is objective, the defendant's own subjective state of mind remains relevant. "In determining whether a reasonable person in defendant's position would have been aware of the risks, the jury should be given relevant facts as to what defendant knew, including his actual awareness of those risks. True ... the defendant's lack of such awareness would not preclude a finding of gross negligence if a reasonable person would have been so aware. But the converse proposition does not logically follow, for if the evidence showed that defendant actually appreciated the risks involved in a given enterprise, and nonetheless proceeded with it, a finding of gross negligence (as opposed to simple negligence) would be appropriate whether or not a reasonable person in defendant's position would have recognized the risk." (*Id*. at p. 1205, italics omitted.)

Above, we concluded the evidence was sufficient to establish Rubio actually appreciated that his conduct was dangerous to the lives of others. Having done so, it is a relatively simple matter to conclude

14

the evidence was sufficient to establish Rubio was consciously indifferent to the consequences of his actions. We reiterate that the evidence presented at trial reflects that Rubio drove through a red light at a speed of 118 miles per hour with a blood-alcohol concentration of at least 0.14 percent. He did so, despite having been warned by his family and friends that he should not drive in such condition and that his conduct was likely to result in injury to himself or others. A reasonable juror could easily reject Rubio's claim that the accident occurred due to mere inadvertence and find instead that Rubio had no care for the consequences of his conduct. This finding is supported by substantial evidence.

As with his challenge to the murder conviction, Rubio contends the evidence here is not as strong as that presented in other cases because there was no evidence he was driving recklessly prior to the collision, his blood-alcohol level was "unexceptional," there was a lack of evidence of his knowledge of the risks, and his driving was "unsafe but not blatantly dangerous." We reject these arguments on the same grounds as stated above. While the jury could have resolved these points in his favor, it did not. On review, our duty is to determine only whether a reasonable trier of fact could find defendant guilty beyond a reasonable doubt, not to determine whether the facts might also support a contrary finding. (*People v. Alexander* (2010) 49 Cal.4th 846, 917.)

We conclude the verdict is supported by substantial evidence.

(Doc No. 13-23 at 9-16); *People v. Rubio*, No. F073217, 2018 WL 6252015, at *4-8.

### 3.  Petitioner is Not Entitled to Relief

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  The federal standard for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury")' *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) ("we acknowledge

1   our obligation under *Jackson* to identify those rare occasions in which 'a properly instructed jury

2   may … convict even when it can be said that no rational trier of fact could find guilt beyond a

3   reasonable doubt").

4       The *Jackson* standard "must be applied with explicit reference to the substantive elements

5   of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

6   408 F.3d 1262, 1275-76 (9th Cir. 2005).  The reviewing court should look to state law to for the

7   elements of the offense and then turn to the federal question of whether any rational trier of fact

8   could have found the essential elements of the crime beyond a reasonable doubt.  *See Johnson v.*

9   *Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

10       Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

11   under a "twice-deferential standard."  *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  As noted by

12   the Supreme Court:

13           First, on direct appeal, "it is the responsibility of the jury−not the
            court−to decide what conclusions should be drawn from evidence
14           admitted at trial. A reviewing court may set aside the jury's verdict
            on the ground of insufficient evidence only if no rational trier of
15           fact could have agreed with the jury." And second, on habeas
            review, "a federal court may not overturn a state court decision
16           rejecting a sufficiency of the evidence challenge simply because the
            federal court disagrees with the state court. The federal court
17           instead may do so only if the state court decision was 'objectively
            unreasonable.' "
18

19   *Coleman*, 566 U.S. at 651.

20       Petitioner was convicted of second degree murder and gross vehicular manslaughter while

21   intoxicated. (*See* Doc. No. 13-23 at 1).  California law defines second degree murder as the

22   unlawful killing of a human being with malice aforethought, but without additional elements that

23   would support a conviction for first degree murder.  *See People v. Chun*, 45 Cal. 4th 1172, 1181

24   (2009).  Malice may be express or implied.  *People v. Beltran*, 56 Cal. 4th 935, 941 (2013).

25   "Malice is implied when a person willfully does an act, the natural and probable consequences of

26   which are dangerous to human life, and the person knowingly acts with conscious disregard for

27   the danger to life that the act poses."  *Id.* at 941–42 (citation omitted).  "A person who, knowing

28   the hazards of drunk driving, drives a vehicle while intoxicated and proximately causes the death

of another may be convicted of second degree murder under an implied malice theory." *People v. Batchelor,* 229 Cal.App.4th 1102, 1112 (2014); *see also People v. Watson,* 30 Cal.3d 290, 296-97 (1981) ("a finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved....)."

Here, the Court of Appeal reasonably determined there was sufficient evidence to support a finding of implied malice within the meaning of California law, by relying on "some or all of the factors that were present" in the California Supreme Court case *People v. Watson*: "(1) blood-alcohol level above the .08 precent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (Doc. No. 13-23 at 11); *see also People v. Wolfe*, 20 Cal. App. 5th 673, 682-83 (2018). First, the record established Petitioner was intoxicated beyond the legal limit and had a predrinking intent to drive. (Doc. 13-23 at 11). The jury heard evidence that Petitioner's blood-alcohol concentration was at least 0.14 percent, and officers observed watery eyes, slurred speech, an odor of alcohol, and impaired coordination; and Petitioner drove to one location and consumed alcoholic beverages, and then drove alone to another location and consumed more alcohol. (*Id*. at 11-12). Petitioner argues his level of intoxication was "less than extraordinary" when compared to levels of intoxication in other cases where a defendant was convicted of second degree murder with implied malice. This argument is misplaced. As noted by the Court of Appeal, "the relevant question is not whether Rubio was extraordinarily intoxicated, but whether driving at his level of intoxication posed a risk to the lives of others and whether he was aware of that risk." (*Id*. at 12 (noting that courts have found implied malice in vehicular murder cases even where the driver was sober)). It was reasonable for the jury to conclude, based the evidence adduced at trial, that (1) Petitioner was intoxicated; and (2) he had a predrinking intent to drive.

Second, as noted by the state court, the record established that Petitioner had knowledge of the hazards of driving while intoxicated. (*Id*. at 11-13). Petitioner argues he had "minimal" exposure to warnings about the dangers of reckless or intoxicated driving because he had previously never been involved in a traffic accident or cited for unlawful driving, and he had not been "exposed to mandatory education" concerning the dangers of reckless or intoxicated driving.

(Doc. No. 1 at 32).  However, the jury heard evidence that Petitioner signed multiple driver's license applications affirming, under penalty of perjury, that he was advised that driving under the influence of alcohol and drugs could lead to a murder charge; and he had been warned by family and friends not to drink and drive "because something like this could happen."  (Doc. No. 13-23 at 13).  The jury could reasonably infer from this evidence that Petitioner was aware of the dangers of driving while intoxicated, as required for a finding of implied malice.  *Cavazos*, 565 U.S. at 7 n.* (reweighing of the facts is precluded by *Jackson*); *Nevils*, 598 F.3d at 1170 (in assessing sufficiency of the evidence claim, it is not the court's function to reweigh the evidence).

Third, as noted by the state court, the record established highly dangerous driving.  (Doc. No. 13-23 at 12-14).  Petitioner argues there was insufficient evidence of implied malice based on a lack of evidence that he drove recklessly prior to the accident, and that his driving at the time of the accident was less "egregious" than other vehicular second degree murder cases.  (Doc. No. 1 at 27-30).  However, "California law does not require evidence of extended dangerous driving for second degree murder."  *Serratos III v. People of the State of California*, 2021 WL 675293, at *10 (E.D. Cal. Feb. 22, 2021) (rejecting petitioner argument that "speeding alone does not support implied malice" noting evidence of highly dangerous driving where petitioner was driving between 95 and 109 miles per hour at the time of the collision); *see also Farley v. Madden*, 2018 WL 1069444, at *8 (C.D. Cal. Jan. 17, 2018) (denying habeas petition because even though "there was no evidence that [Petitioner] had engaged in reckless or highly dangerous driving before the collision, the evidence supported a finding that he caused the collision by making the highly dangerous maneuver of making a left turn against a red light and accelerating into an intersection.").  The jury heard evidence that, at the time of the collision, Petitioner ran a red light at the speed of 118 miles per hour, 73 miles per hour over the legal speed limit, without braking and with his accelerator fully depressed. (Doc. No. 12-23 at 12).  Notably, Petitioner himself testified that driving on New Stine Road over 80 miles per hour is dangerous.  (*Id*.).  On this record, it was reasonable for the Court of Appeal to conclude that "[i]t is difficult to imagine a set of facts less likely to preclude a jury from concluding that this conduct evidences a complete disregard for the lives of others."  (*Id*. at 13).

Finally, to the extent Petitioner argues there was insufficient evidence to support his conviction for gross vehicular manslaughter while intoxicated for the same reasons outlined above,[2] the Court of Appeal reasonably found the evidence was sufficient to establish Petitioner was consciously indifferent to the consequences of his actions, particularly in light of the finding, discussed in detail *supra,* that there was sufficient evidence that Petitioner "actually appreciated" his actions were dangerous to the lives of others.  (Doc. No. 13-23 at 15).  Under California law, the elements of gross vehicular manslaughter while intoxicated are: (1) driving a vehicle while intoxicated; (2) when so driving, committing some unlawful act, such as a Vehicle Code offense with gross negligence, or committing with gross negligence an ordinarily lawful act which might produce death; and (3) as a proximate result of the unlawful act or the negligent act, another person was killed.  *See* Cal. Pen. Code § 191.5, subd. (a); *People v. Verlinde,* 100 Cal.App.4th 1146, 1159 (2002), *disapproved on other grounds in People v. Cook,* 60 Cal. 4th 922, 939 (2015).  "Gross negligence is the exercise of so slight a degree of care as raise a presumption of conscious indifference to the consequences. 'The state of mind of a person who acts with conscious indifference to consequences is simply, I don't care what happens.'"  *People v. Bennett,* 54 Cal.3d 1032, 1036–1038 (1991) (citing *Watson,* 30 Cal. 3d at 296).  The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. *Watson,* 30 Cal. 3d at 296.

As detailed *supra,* the jury heard evidence that Petitioner drove through a red light at a speed of 118 miles per hour; he had a blood-alcohol content of at least 0.14 percent; and he had been warned by family and friends that driving while intoxicated was likely to injure himself or others.  (Doc. No. 13-23 at 15-16).  On this record, it was reasonable for the Court of Appeal to determine there was substantial evidence to support Petitioner's conviction for gross vehicular manslaughter while intoxicated.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Petitioner acted with implied malice as that

---

[2] The Petition contains only a single sentence on this claim.  (Doc. No. 1 at 5).  In an abundance of caution the Court addresses the claim.

element of second degree murder is defined under California law, and acted with gross negligence as required for a conviction of gross vehicular manslaughter while intoxicated.  As such, the Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  The undersigned recommends that ground one be denied.

### B. Ground Two: Fourth Amendment Claim

#### 1. Background

In his second ground, Petitioner argues the trial court committed reversible error by denying his motion to quash and traverse the blood-draw warrant and suppress evidence of his unlawful blood alcohol level because the "statements made to convince a judge to authorize a compulsory blood test were deliberately false or made in reckless disregard for the truth and the remaining information was insufficient to provide probable cause."  (Doc. No. 1 at 34). Specifically, Petitioner contends that in attempting to obtain the search warrant for a blood-draw, the officer "falsely" reported to the judge that Petitioner refused to submit to any chemical test when obtaining the search warrant, when in fact Petitioner had voluntarily submitted to breath tests.  (*Id*. at 34-35).  The trial court denied Petitioner's motion because it did not prove the officer's statements in support of the warrant were deliberately false or made with reckless disregard for the truth; and there would have been probable cause to issue the blood-draw warrant even without the allegedly false statement.  (*Id*. at 37-38).  Petitioner additionally argues that the trial court erred by refusing to reconsider the defense motion to quash and reverse the warrant based on "newly discovered evidence provided [in trial testimony] that no officer had offered or asked Rubio to take a breath test."  (*Id*. at 44).

In its Answer, Respondent argues Petitioner had an unimpeded opportunity to litigate his Fourth Amendment claim, both in trial and on direct appeal, and therefore his claim is not cognizable on federal habeas review pursuant to *Stone v. Powell*, 428 U.S. 465 (1976).  (Doc. No. 12 at 28-29).

#### 2. State Court Decision

The Court of Appeal concluded it "need not determine whether the motion to traverse and

20

1    motion for reconsideration were properly denied because admission of the blood draw evidence

2    was harmless beyond a reasonable doubt."  (Doc. No. 13-23 at 19).  In support of this finding, the

3    appellate court noted evidence of Petitioner's highly intoxicated state at the time of the collision

4    was established through "unchallenged evidence" aside from the blood evidence, including

5    officer testimony about Petitioner's demeanor, appearance, performance on field sobriety tests,

6    and breath tests showing a blood-alcohol concentration of 0.14 percent.  (*Id*.).  In addition, the

7    appellate court noted that prosecutor only briefly mentioned the blood test evidence in closing

8    arguments, focusing instead on Petitioner's reckless driving and his attitude, as opposed ot his

9    level of intoxication.  (*Id*. at 19-20).  Finally, the jury rejected the allegation that Petitioner's

10   blood-alcohol level was twice the legal limit in finding "not true" the allegation that Petitioner

11   had a blood-alcohol content of 0.15 percent or greater.  (*Id*. at 20).  "Arguments regarding the

12   blood test were therefore insignificant in relation to everything else the jury considered." (*Id*.)

13   (citing *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *disapproved on other grounds in Estelle v.*

14   *McGuire*, 502 U.S. 62, 72 n. 4 (1991) ("To say that an error did not contribute to the verdict is . . .

15   to find that error unimportant in relation to everything else the jury considered on the issue in

16   question, as revealed in the record.").

17                   **3.  Petitioner is Not Entitled to Relief**

18          The Fourth Amendment protects against "unreasonable searches and seizures" and

19   provides, *inter alia*, that no search warrant shall be issued "but upon probable cause."  U.S.

20   Const. amend IV.   In *Stone v. Powell*, the Supreme Court held that when a state court has

21   provided petitioner with a full and fair opportunity to litigate a Fourth Amendment claim,

22   federal habeas relief is not available on the ground that evidence obtained in an unconstitutional

23   search or seizure was introduced at trial.  428 U.S. 465, 494-95 (1976); *Newman v. Wengler*, 790

24   F.3d 876, 878-80 (9th Cir. 2015) (holding *Stone* remains good law after AEDPA).  Thus, "[t]he

25   relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did

26   in fact do so or even whether the claim was correctly decided."  *Newman*, 790 F.3d at 880;

27   *Moormann v. Schriro*, 426 F.3d 1044, 1053 (9th Cir. 2005) (finding that petitioner had a full and

28   fair opportunity to litigate his Fourth Amendment claim because he raised the claim in a pre-trial

motion, the trial court held a hearing and denied his motion, and an appellate court reviewed the trial court's decision).

Petitioner filed a pre-trial motion to quash and traverse the search warrant and suppress the blood-alcohol evidence obtained pursuant to Cal. Penal Code § 1538.5.  (*Id*. at 35).  The trial court conducted a hearing and denied the motion; and, as discussed *supra*, Petitioner was afforded appellate review.  (*Id*. at 37-38; Doc. No. 13-23 at 16-21).  Accordingly, Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim.  Because ground two is not cognizable on federal habeas review under *Stone,* the undersigned recommends that ground two be denied.

### IV.  CERTIFICATE OF APPEALABIILTY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the denial of a constitutional right.  Thus, the undersigned recommends that the court decline to issue a certificate of appealability.

Accordingly, it is **RECOMMENDED**:

1. The Petition be denied.  (Doc. No. 1).

2. Petitioner be denied a certificate of appealability.

### NOTICE TO PARTIES

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14)

days after being served with these findings and recommendations, a party may file written

objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations."  Parties are advised that failure to file objections within the

specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834,

838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


Dated:     March 14, 2023

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE